# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

KEITH A ROBERTSON,       )
                              )
      Plaintiff,           )
                              )
      v.                )     Case No. 1:11-cv-00143-TWP-TAB
                              )
                              )
MICHAEL J. ASTRUE,       )
Commissioner of Social      )
Security Administration,    )
                              )
      Defendant.      )

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Keith A. Robertson ("Mr. Robertson"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Mr. Robertson's application for Social Security Disability Benefits. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

Mr. Robertson was born on July 16, 1958. (R. at 802.) He was 46 years old on his alleged onset date of December 1, 2004. (R. at 61.) He has a high school education and worked as a skilled brick mason from 1977 to 1997; he then worked as a mason estimator until 2005. (R. at 290. 830.) He has three children, is separated from his wife, and now lives with his father. (R. at 803.)

### A.    Procedural History

On October 14, 2005, Mr. Robertson filed an application for disability insurance benefits ("DIB"), alleging that he became disabled on December 1, 2004. His application was denied initially and upon reconsideration. On November 25, 2008, Mr. Robertson appeared in

Indianapolis, Indiana with attorney, Andrew Sheff, and testified at a hearing before Administrative Law Judge Peter C. Americanos ("the ALJ"). On March 2, 2009, the ALJ issued his decision finding that Mr. Robertson was not disabled. On December 1, 2010, the Appeals Council upheld the ALJ's decision by denying Mr. Robertson's request for review. The ALJ's decision is therefore the final decision of the Commissioner for purposes of judicial review.

**B.     Medical History**

On May 7, 1999, Mr. Robertson visited Dr. Jonathon Helvie ("Dr. Helvie") for shoulder pain; in doing so, he also noted that he had experienced pain in his shoulders, elbows, and back for 20 years. (R. at 107.) Mr. Robertson also described the series of prednisone dose packs and injections that he had been prescribed in order to ease his shoulder pain. *Id*. Dr. Helvie noted that Mr. Robertson was "quite conversive" and "does not appear in a great deal of pain." (R. at 108.) Dr. Helvie noted areas of tenderness and that Mr. Robertson's "range of motion in the shoulder, elbow, and wrist and hand area is good." Dr. Helvie concluded that Mr. Robertson might be suffering from myofascial pain syndrome, which was most likely aggravated by muscle overuse through his work as a brick mason. *Id*. Dr. Helvie recommended exercises, performed trigger-point injections on Mr. Robertson's shoulders, and prescribed medications including Ultram, Lorcet, and Elavil. *Id*. As scheduled, Mr. Robertson returned a month later; at that time, he received bilateral steroid injections of the acromioclavicular joints. (R. at 104.)

Throughout 2000, Mr. Robertson received additional trigger point injections for his myofascial pain syndrome. On a February 7, 2000 visit, Dr. Helvie noted that Mr. Robertson complained that his "pain is everywhere" at a level of 6 out of 10; Dr. Helvie also noted that Mr. Robertson "has not been exercising as previously recommended." (R. at 98.) When Dr. Helvie asked Mr. Robertson why he wasn't adhering to the exercise program, he responded "that it was

easier to take a pill to help his pain." *Id*. Dr. Helvie observed that Mr. Robertson "does not seem interested in taking an active part in helping his condition." *Id*. On a July 13, 2000 visit, Dr. Helvie reported that Mr. Robertson gets "some relief with trigger point injections" but seems "overly focused on obtaining medication" and that this was "a poor way to control chronic pain." (R. at 94.) On October 28, 2000, Mr. Robertson reported that he was "doing better" and that the medications and injections were helping. (R. at 92.) However, by December 13, 2000, Mr. Robertson was less optimistic, complaining of "the winter blues"; he further complained that his pain was a 5 out of 10 and received seven trigger point injections. (R. at 90.)

In February 2001, Mr. Robertson saw Dr. Chetan Shukla ("Dr. Shukla") at Clarian Health for pain in his shoulders, elbows, and back. (R. at 463.) Dr. Shukla concluded that Mr. Robertson was suffering from myofascial pain. Mr. Robertson reported that he experienced temporary pain relief for about three weeks after receiving trigger point injections, but that any kind of activity made his pain worse. *Id*. Dr. Shukla determined that Mr. Robertson had restricted range of motion in the cervical and lumbar spine as well as diffuse tenderness over the bilateral paraspinal areas over the cervical, thoracic, and lumbar spine. *Id*. Dr. Shukla also found tender areas over the left anterior chest and the left acromioclavicular joint. *Id*. Dr. Shukla noticed that Mr. Robertson appeared to be "somewhat depressed." *Id*. Dr. Shukla continued with the trigger point injection therapy, administering five injections. *Id*.

On several occasions in 2002, Mr. Robertson sought treatment for depression from James Teague, Ph.D. On October 10, 2002, Mr. Robertson reported that he was feeling better physically and had been "trying to get out more and has been going grocery shopping with his wife and on walks." (R. at 467.) However, he was still struggling with depression and his relationships. *Id*.

Mr. Robertson's pain continued in 2003. At that time, Mr. Robertson was working 40 hours a week as an estimator. (R. at 691.) Following an examination on May 9, 2003, Dr. Kolowitz diagnosed Mr. Robertson with fibromyalgia. (R. at 692.) Dr. Kolowitz found Mr. Robertson's range of motion to be "approximately three-quarters functional … with pain at the extremes." (R. at 691.) Dr. Kolowitz also found, "his fibro examination is positive in 11 of 18 tender points." *Id.* Dr. Kolowitz recommended that Mr. Robertson maintain the pain medication and treatment, visit the physical therapy staff, and attend a fibromyalgia class. (R. at 692.) Mr. Robertson underwent a physical therapy initial evaluation on May 20, 2003. (R. at 697.) There, it was noted that his pain ranged from a 4 to an 8 out of 10, and that he "is currently having difficulty walking greater than 15 minutes, bending to get his lawnmower out, is unable to participate in sports, and has pain going up and down stairs." *Id.*

Dr. Kolowitz examined Mr. Robertson a second time in June 2003. Dr. Kolowitz noted that Mr. Robertson was compliant with the first portion of his physical therapy courses, and that Mr. Robertson suffered from diffuse body pain, fibromyalgia, and back and radicular leg pain. (R. at 690.) The doctor also noted that neither morphine nor duragesic appeared to give Mr. Robertson any relief. Dr. Kolowitz stated, "I believe his pain syndrome is declaring itself opioid non-responsive." *Id.* Dr. Kolowitz also ordered an MRI, which revealed the following:

L5-S1. Moderate disc space narrowing and dehydration. A broad-based shallow disc protrusion is present centrally. No stenosis or nerve root compression is identified. The neural formina are uncompromised. Minor facet joint degeneration is present bilaterally.

L4-5. There is mild disc space narrowing and dehydration. The posterior annulus is intact. Central canal and nerve root canals are uncompromised and the facet joints are unremarkable.
L3-4. There is a moderate dehydration and disc-space narrowing. Circumferential bulging of the annulus is noted without focal herniation. There is no significant central stenosis. Mild forminal narrowing is present without nerve root compression. The posterior element is grossly intact.

L2-3. No significant abnormalities are noted.

L1-2. There is moderate dehydration with circumferential bulging of the annulus and moderate ventral osetyphyte spurring. Increased signal intensity is noted with posterior annulus. There is mild narrowing of the central canal in the AP diameter without significant stenosis. Neural foramina are unremarkable.

The reviewing radiologist's conclusion was "multilevel moderate to moderately-advanced disc degeneration involving the lower thoracic and lumbar spine." (R. at 704-05.)

Following the MRI, Dr. Kolowitz developed a treatment program that included epidural steroid injections. Dr. Kolowitz injected Mr. Robertson at L5-S1 on June 27, 2003. (R. at 688.) At this time, Mr. Robertson reported a reduction in pain from a 7 to a 4 out of 10. *Id.* On July 7, 2003, Dr. Kolowitz removed Mr. Robertson from opioids finding that his impairments were unresponsive to the drugs. (R. at 687.) On July 11, 2003, three epidural injections were attempted but only two were successful. Mr. Robertson received an epidural injection at L3-L4 and L4-L5, while L5-S1 was too difficult to reach. (R. at 685.) Mr. Robertson returned on November 19, 2003 and received an L5-S1 epidural injection. The related report noted that "[h]e has responded well to translaminar epidural steroids." (R. at 684.)

In January 2004, Mr. Robertson was referred to Dr. John Kincaid ("Dr. Kincaid") at Indiana University for a consultation regarding migraine headaches. Dr. Kincaid found that the headaches were possibly the result of a spinal nerve sleeve rupture or a micropuncture of the dura, both of which could have been caused by the epidurals. (R. at 547.) Two days following this initial examination, Mr. Robertson presented himself at the IU Emergency Room with a severe unremitting headache. (R. at 544.) It was unclear to the doctors "whether the headache was a result of an exacerbated migraine, to the point of being in status migrainous, or whether

this was an atypical manifestation of a post spinal, low-pressure type headache." *Id*. Mr. Robertson was treated with infusions of dihydroergotamine, which provided relief. (R. at 545.)

In a later physical examination, Dr. Kincaid found that Mr. Robertson's headaches "have been under relatively good control." However, his back continued to bother him greatly. Dr. Kincaid reviewed his relevant medical history, noting that Mr. Robertson had been examined by the St. Francis Pain Center but, in Mr. Robertson's words, they "would not reaccept him." (R. at 543.) Under "impressions," Dr. Kincaid wrote that Mr. Robertson had "persisting back pain with some radicular features. I suspect much of this is either facette or soft tissue in nature, given the lumbar MRI did not show any significant disc or osteophyte formation." (R. at 544.) On May 5, 2004, Mr. Robertson returned to Dr. Kincaid for a follow-up visit. Dr. Kincaid had removed Mr. Robertson from a prescription for propanolol and a nine-day period of intense migraines followed. However, after those nine days, the migraines "quieted down and [have] not reappeared." Mr. Robertson continued to complain of back pain, but further noted that he "is trying to do masonry estimating … rather than actually going back to brick laying" and "thinks this will work out." (R. at 542.)

In April 2004, Dr. Brian S. Foley ("Dr. Foley") first examined Mr. Robertson and administered facet injections to the tender areas. (R. at 484.) Dr. Foley also administered epidural steroid injections in June, August, and November 2004, which provided Mr. Robertson with some relief. (R. at 536-38.) In January 2005, Mr. Robertson was evaluated by Dr. Joseph Riina ("Dr. Riina"), an orthopedic surgeon at OrthoIndy. In the examination Mr. Robertson told Dr. Riina, "the pain is getting worse in that it is present more often and getting worse in that is more intense." (R. at 492.) Dr. Riina noted that Mr. Robertson appeared healthy and "in no acute distress," but that he "appears to be in mild pain." (R. at 494.) Dr. Riina ordered a new

MRI and referred Mr. Robertson to a physiatrist. (R. at 495.)  The MRI was performed on January 14, 2005, and yielded the following:

> L5-S1. There is mild interval increase in size of moderate broad-based posterior disc protrusion measuring 4mm in thickness. The disc protrusion now extends into the left posterolateral region measuring 5mm in thickness and was not seen on the prior exam. This now slightly impinges on the left S1 sacral nerve root and may contact the right S1 sacral nerve root. This is superimposed on a small diffuse disc bulge, resulting in stable minor narrowing of the neural foramina bilaterally without significant spinal stenosis.

> L4-5. There are no focal disc protrusions. No significant spinal stenosis or neural foraminal narrowing.

> L3-L4. There is a stable small diffuse disc bulge measuring 3mm in thickness and is asymmetric to the left side resulting in stable moderate narrowing of the left neural foramen and may contact the left L3 exiting nerve root and ganglion and mild narrowing of the right neural foramen. No significant spinal stenosis.

> L2-L3. There are no focal disc protrusions.

> L1-L2. There is a stable moderate diffuse disc bulge measuring 4mm in thickness resulting in stable borderline spinal stenosis, with the thecal sac measuring 10 mm in AP dimension. No significant neural foraminal narrowing.  (R. at 789.)

Dr. McLimore of OrthoIndy performed the physiatry consultation.  Using the recent MRI information, Dr. McLimore found that Mr. Robertson's pain pattern "maps out in a left S1 and probable concurrent L3 pattern."  (R. at 490.)  Dr. McLimore recommended a Pain Patient Profile (P3) to better determine the psychological factors that could be affecting treatment.  (R. at 491.) These results showed that Mr. Robertson was more depressed than the average pain patient, making the depression likely to interfere with his treatment (R. at 503).  The report explained:

> Sleep and appetite disturbances may be noted as part of the patient's depression symptoms.  He may be described by others as sad, lethargic, apathetic, listless, and aloof.  Efforts to involve him in a participatory physical rehabilitation program may be hampered by his emotional state.  It is likely that he suffered highly significant symptoms and problems with depression prior to pain onset or that he is currently feeling particularly distressed, drained, and emotionally

burdened by the duration of his discomfort and the impact of his problems on his ability to function. The clinician should investigate whether a history of depression preceded pain onset or whether depression symptoms are reactive to pain. If depression is acute, the patient should be carefully and regularly monitored to guard against further emotional deterioration. It is very likely that the patient's psychological symptoms will interfere with physical pain treatment. (R. at 505.)

The report recommended that Mr. Robertson see a mental health professional and that the use of anti-depressant medication should be considered. (R. at 506.) On February 4, 2005, Mr. Robertson visited his family physician, Dr. Bernard Herbst ("Dr. Herbst"). Mr. Robertson confided that he felt hopeless about his situation and that Dr. Riina had placed him on Neurontin with no change in his condition. (R. at 554.)

On February 8, 2005, Dr. McLimore performed selective nerve root blocks and transforaminal epidural corticosteroid injections on both the left L3 and left S1. (R. at 497). Subsequently, Dr. Herbst referred Mr. Robertson to Dr. John Swofford for consultation regarding surgical implantation of a dorsal column nerve stimulator, writing:

I'm referring Mr. Keith Robertson to Dr. Swofford for possible dorsal column stimulator, due to intractable pain from spinal problems and failure to have reasonable improvement in spite of numerous modalities of therapy. He's been to five specialists (ortho/neurosurgery, paid clinics/etc) and tried numerous medications including anticonvulsants, tricyclics, SSRI's, analgesics in increasing amount and strength, etc. Also, he's been through nerve blocks, facet injections, and epidural steroids with no relief. He's even been evaluated by psychiatry for pain evaluation/coping skills, etc. (R. at 362.)

Dr. Swofford found Mr. Robertson to be a good candidate for a nerve stimulator for two reasons: (1) Mr. Robertson was unable to find long-term relief after different procedures and treatments; and (2) Mr. Robertson was not a candidate for corrective back surgery at that time. (R. at 499.) On May 2, 2005, stimulator leads were surgically implanted on Mr. Robertson's spine on a trial basis. (R. at 577.) After having "excellent relief with the trial," on May 23, 2005, Dr. Swofford implanted the stimulator in Mr. Robertson's body and placed permanent

leads on Mr. Robertson's spine. (R. at 575.) Although Mr. Robertson did receive some relief from the implanted stimulator, he still experienced pain. Accordingly, Dr. Swofford administered a lumbar epidural steroid injection as adjunctive therapy on August 30, 2005. (R. at 573.) Mr. Robertson received an additional injection on October 26, 2005. (R. at 569.)

On December 30, 2005, Dr. Poplia examined Mr. Robertson for the Social Security Administration ("SSA"). Dr. Poplia stated as follows:

> The patient presents alleging disability secondary to stabbing chest pain in the left chest with shortness of breath. Patient states lying down, coughing and taking a deep breath starts the pain while rest helps to alleviate it. Patient rates the pain 6-8 on a scale of 0/10. Frequency of pain is 3-4 times per month and duration lasts from 1 hour to 4 hours. Patient also alleges back pain, leg pain, migraine headaches, fibromyalgia, depression, high cholesterol and high blood pressure. (R. at 397.)

Under physical movements, Dr. Poplia noted that the patient is "well developed, no limitations in meeting the demands of the examination." Under musculoskeletal, Dr. Poplia noted "normal posture, normal gait stability, speed, and sustainability; range of motion is limited … the patient is able to walk on his toes but not his heels … tender lumbar spine to light touch, negative straight leg raising." Under impression, Dr. Poplia noted chronic low back pain, chronic chest wall pain and tenderness, HTN, depression, and migraine headaches.

On March 21, March 23, and August 1, 2006, Mr. Robertson returned to Dr. McLimore for additional steroid injections (R. at 136-37, 156, 158-60). At Mr. Robertson's last visit on September 7, 2006, Dr. McLimore noted the following:

> He still describes some ongoing lombago, preferentially left-sided with radiation into the left lower extremity from the back, buttock, posterior lateral thigh, and posterior lateral left leg to the heel. He gets some radiation partially to the right thigh, but not below the knee. He describes 60% back, 40% left lower extremity pain. He had on 08/06 a left L5-S1 interlaminar lumbar epidural corticosteroid injection. He states he had 4-5 weeks of at least 50% improvement. He rates the pain at rest 7 and with activity 7+. He has been taking oxycodone and Lyrica medication through his family practitioner. (R. at 133.)

Dr. McLimore concluded:

> The natural history of the problem and treatment options were discussed at length. At this point, we have exhausted all conservative measures that have included interventional pain management (interlaminar ESI- selective nerve block roots) and in addition he has a dorsal column stimulator placed by Dr. Swofford. He has had a P3 psychometric screen that was negative for somatization disorder. He has described elements of depression that is reactive to his chronic pain. He has gained some weight here recently. We discussed the importance of weight reduction. He is understanding of a home exercise program. He also tried a TENS unit in the past without much benefit. He continued with his current medication regimen through his family practitioner. He did see the PA of Dr. Riina's in the past. He would like to get a formal opinion from Dr. Riina to see if indeed he may qualify for surgical intervention. He may need diskogram updated to definitively clarify at this stage as he states his pain is becoming progressively worse over the last three to six months with progressive sciatica. EMG studies have been ordered. I left follow-up on a p.r.n. basis with me. I will await Dr. Riina's opinion…If he is not a surgical candidate, the next step would be March 2007 if necessary to do a bilateral S1 selective nerve root block. Otherwise, there is nothing further that I would have to offer him. (R. at 133.)

In June 2007, Mr. Robertson began seeing Dr. Dan Nordmann ("Dr. Nordmann") at the Indiana Spine Group. Upon examining Mr. Robertson, Dr. Nordmann found that "he has diminished lumbar lordosis and increased muscle spasm in the lower back. He has had slightly positive straight leg raise on the left." (R. at 123). Dr. Nordmann ordered a new CT scan, which revealed the following:

> L1-L2. There is a mild facet sclerosis. There is a mild broad-based disc bulge. There is no nerve root compression. There is some mild spinal stenosis at L1-L2.

> L2-L3. There is a mild broad-based disc bulge identified. There is no nerve root compression. There is no significant spinal stenosis.

> L3-L4. There is a diffuse disc bulge identified. Some far lateral nerve root compression on the left cannot be excluded. There is mild spinal stenosis. There is facet sclerosis.

> L4-L5. There is moderate broad-based disc bulge. There is no significant spinal Stenosis and there is no nerve root compression.

L5-S1. There is no definitive nerve root compression. There is no spinal stenosis. (R. at 127-28).

After the CT scan, Dr. Nordmann treated Mr. Robertson with a series of epidural steroid injections. Mr. Robertson received three injections from Dr. Nordmann in 2007, (R. at 114-16), and again returned to Dr. Nordmann on January 8, 2008. (R. at 129.)

Dr. Herbst, Mr. Robertson's primary care physician who had been treating him since 1985, provided a statement to Mr. Robertson's counsel in which he summarized the treatments and referrals he had coordinated for Mr. Robertson. (R. at 190-93.) Dr. Herbst has retained sole responsibility for prescribing pain medications "for safety reasons and to keep some continuity," and maintained close follow up with Mr. Robertson. (R. at 191.) Dr. Herbst stated that the objective tests and Mr. Robertson's "signs and symptoms do give us the picture that he has some irritative nerve root problems and that he suffers from sciatica on a chronic basis." (R. at 192.) Dr. Herbst further explained:

> We have many patients who have no real surgical lesion found on their evaluations, but have definite signs and symptoms of back pain and nerve root irritation. In fact, it is probably more common to see people without severe x-ray abnormalities and yet have subjective symptoms that would tell us what the problems are … or at least where the locations of the problems are. So it is not unusual to have this degree of pain in spite of a finding that surgery is not recommended. I think people tend to believe that, if it is not bad enough to require surgery, it can't be that bad. But any specialist in the spine field will tell you that most of the patients they see with chronic pain are not surgical candidates. This is the real challenge today -- the patients with spinal problems that we can't just fix with surgery. They are the most difficult to manage. It would be so nice if we had a correctable lesion that we could just deal with, like patients sometimes think, and be cured and move on with life. But that is not the case with Keith Robertson at all. (R. at 192.)

When asked whether Mr. Robertson could "perform a job on a regular basis that called for continuous lifting or carrying of objects," Dr. Herbst responded:

> This gentleman absolutely should not be engaged in any kind of employment that would require much carrying, let alone lifting, and certainly avoiding any

squatting or bending.  Things that require a lot of physical activity would just be too much for him.  In fact, not recently, but for the last ten years, I had been telling the gentleman that he needed to change his occupation from masonry work to something that is more sedentary because he was experiencing multiple joint and back problems going back through many years that were aggravated and caused by this type of work.  (R. at 193.)

Moreover, Dr. Herbst explained that, even though he believed the medications necessary to help mitigate the pain, the cumulative side effects of the medications adversely affected Mr. Robertson's ability to function in a competitive work environment.

In fact, his medication regimen is such that I would think that it would be very difficult to expect him to maintain any high functioning level of even a sedentary job that would require concentration and focus, which includes most desk jobs. He is often drowsy due to his medication, with multiple side effects from them. Many times it would be unsafe for him to drive an automobile back and forth to work because of his condition and the adverse effects of his medications. Certainly, given the fact that he cannot maintain a high level of mental sharpness and high-cognitive functioning because of his medicines, I think it would be very difficult to expect him to have any meaningful, certainly competitive-paced job, even sedentary work, let alone, return to what he was doing before.  (R. at 193.)

## C.     The Administrative Hearing

### 1.     <u>Mr. Robertson's Testimony</u>

At the administrative hearing, Mr. Robertson testified that he was a masonry contractor for twenty years.  (R. at 806.)  During those years, Mr. Robertson testified, he developed shoulder, elbow, and right hand problems. *Id.*  He testified he has had surgery on both elbows, both shoulders, and his right hand, but none of the surgeries relieved his pain. *Id.*  Doctors advised him to seek alternative employment, which he did.  *Id.*  Mr. Robertson also testified that he had surgery in September 2005 for mild right-side carpal tunnel syndrome, and, more recently, he experienced some symptoms of left-side carpal tunnel, but his doctor instructed him to wear a splint, which resolved the symptoms.  (R. at 822-23.)

When prompted by the ALJ to discuss what happened on December 1, 2004 (disability date), Mr. Robertson testified that he worked from home as a masonry estimator until the pain in his back became unbearable from sitting over a table. (R. at 804.) He testified he had to frequently take breaks by lying down to relieve the pain. *Id.* After awhile, the pain escalated to the point where he was unable to pay attention and began making mistakes. *Id.* Mr. Robertson testified that the doctors diagnosed him with low back degenerative disc disease, a herniated disc, and arthritis. *Id.* When asked about treatments, Mr. Robertson testified that he has received steroid epidural injections and a stimulator implant, but opted not to undergo surgery. (R. at 804-05, 819.)

During a series of questions by the ALJ, Mr. Robertson estimated he can sit between fifteen to twenty minutes, maybe twenty-five if he has a comfortable chair; stand for ten minutes; lift between twenty to thirty pounds four or five times in a day;[1] and walk "a couple" of blocks with a self-prescribed cane he has been carrying for the last year and a half. (R. at 812-13, 819.) Mr. Robertson testified he drives to his brother-in-law's house, which is ten miles away from where he lives, and goes to restaurants once or twice a week with his father. (R. at 813-14.)

Mr. Robertson testified he has experienced back pain since the age of twenty-two, when he fell off a roof. (R. at 806.) He also testified that he has had migraines since his early twenties, (R. at 807), and that his migraines occur roughly six to seven times a month. (R. at 816.) He testified that, when he experiences a migraine, he has to lie in bed in a dark room with no sound; moreover, if the migraines are really bad, he must take off from work. (R. at 808.) As a result of the migraines, Mr. Robertson testified, he would take a couple days a month off from work. (R. at 807-08.) A medicine he takes called Relpax provides him with some relief. (R. at

---

[1] Later, when questioned by his attorney, Mr. Robertson testified he has trouble lifting a gallon jug of milk, so his father buys half gallon containers instead. (R. at 820.)

808.) Mr. Robertson also testified that he takes Oxycontin and morphine to relieve his other pain. The worst side effect he experiences from these medications is constipation, and the doctor does a check-up every four months to make sure his medications are not causing problems with his liver and other systems. (R. at 820-21.)

When asked about other problems, Mr. Robertson testified he recently (within the last six to eight months) began experiencing constant pain in his knees. (R. at 811.) He testified that he mentioned it to his primary care physician, who injected cortisone in each one of his knees. *Id.*

## 2. Medical Expert's Testimony

A medical expert, Dr. Richard Hutson ("the ME"), who is board certified in orthopedic surgery, testified at the hearing. (R. at 824, 835.) The ME testified that the medical evidence revealed that Mr. Robertson had multilevel degenerative disc disease in his lower back. (R. 821-22.) After he had a spinal cord stimulator implanted, testing revealed some mild spinal stenosis, some left lateral nerve root compression, and a possible lateral disc herniation, but there were no clinical findings indicating that this was a problem. (R. at 822.) The ME concluded that Mr. Robertson had a vertebrogenic disorder with degenerative disc disease in the lumbar area of his spine. (R. at 824.) However, his condition did not meet or equal Listing 1.04 because he did not have the appropriate loss of neurological function. *Id.* The ME added that, because of the implanted spinal cord stimulator, Mr. Robertson should do no more than sedentary work. *Id.*

When questioned by Mr. Robertson's attorney, the ME testified that he was aware of Mr. Robertson's descriptions of pain; however, he noted that there are no objective medical tests for pain. *Id.* Thus, there was nothing he could do to prove or disprove Mr. Robertson's subjective complaints of pain at any given time. *Id.* The ME did testify, however, that Mr. Robertson's complaints of pain were consistent with his condition and the condition was objectively

documented. (R. at 825.) Furthermore, the ME testified that the non-surgical medical treatments Mr. Robertson received were consistent with objective findings of his back condition. *Id.* Mr. Robertson's attorney then asked whether the following facts were consistent with objective medical evidence: 1) the fact that Mr. Robertson had only temporary relief, and 2) the fact that Mr. Robertson was not offered a surgical solution to his medical problem. *Id.* The ME responded in the affirmative. *Id.*

Upon re-questioning by the ALJ, the ME testified to the significance of Mr. Robertson's spinal cord stimulator, which can be jarred and broken when moving around, lifting, and bending. (R. at 828.) Additionally, when asked whether Mr. Robertson's file contained evidence of headaches, the ME replied in the affirmative and testified that Mr. Robertson had been hospitalized between January and February 2004 for treatment of migraines. (R. at 830-31.)

### 3. **Vocational Expert's Testimony**

Michael Blankenship, the vocational expert ("the VE"), testified that Mr. Robertson's previous position was as an estimator for a masonry company. (R. at 829.) The VE described the job as a sedentary position with a Service Vocational Preparation ("SVP") of seven. *Id.* The VE testified that the position requires reviewing sketches, measurements, and blueprints; utilizing methodologies and techniques to determine the price for time and labor; estimating the number of hours it will take to complete a job; and being knowledgeable about vendors. (R. at 830-31.) The VE also testified that Mr. Robertson's occupation prior to his work as an estimator was as a bricklayer or mason. (R. at 830.) He described the job as a heavy and skilled position with an SVP of eight. *Id.*

The ALJ questioned the VE regarding whether a hypothetical individual with the claimant's same age, education, and work experience can do the prior sedentary work of the

claimant, but in addition to being sedentary, such an individual must be allowed to take off work one day a month. (R. at 831.) The VE responded in the affirmative and testified the occupations such an individual could perform include cost-estimators. (R. at 831-32.) The VE testified there are 2,517 cost-estimators in the State of Indiana, but noted the claimant's skills would not be readily transferable to some of the jobs in this category, such as plumbing and drywall cost-estimators. *Id.* However, he testified the claimant's acquired job skills would be readily transferable to approximately 1,200 to 1,300 of these jobs. *Id.*

The ALJ proceeded to question the VE by adding additional limitations to the previously described hypothetical. First, the ALJ asked if anything would change if the number of days off work increased to two days a month. (R. at 832.) The VE responded that once the individual got through the probationary period and combined his sick days, vacation days, and personal time off, he might be able to take two days off per month. (R. at 833.)

Next, the ALJ asked if the additional limitation of doing no more than occasional bending, kneeling, stooping, and no squatting, changed any of the VE's answers. *Id.* The VE testified it would not. *Id.* He noted that the ALJ's limitation is described as stooping by the Department of Labor, which involves moving from a standing to a seated position. *Id.* He further noted that Mr. Robertson had changed from a standing to seated position a couple times during the hearing without any noticeable difficulty. *Id.*

Lastly, the ALJ asked if the additional limitation of alternating between standing and sitting five minutes per hour without leaving the work station would change anything. *Id.* The VE testified it would not. *Id.* Pursuant to SSR 00-4p, the ALJ asked the VE if his testimony was

in accordance with the information contained in the Dictionary of Occupation Titles. He responded in the affirmative. (R. at 834.)[2]

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment … which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's

---

[2] Notably, Mr. Robertson's father also testified at the hearing. His testimony was generally consistent with Mr. Robertson's.

findings, the ALJ's findings become the findings of the Commissioner. *See Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* Although a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III. <u>DISCUSSION</u>

**A.      The ALJ's Findings**

The ALJ found that Mr. Robertson met the disability insured status requirements of the Social Security Act on March 31, 2008, and that Mr. Robertson had not engaged in substantial gainful activity since his alleged onset date of December 1, 2004, through his date last insured of March 31, 2008. (R. at 15.) The ALJ found that Mr. Robertson suffers the following severe

impairments: disorder of the back and headaches. *Id.* The ALJ concluded that Mr. Robertson's back impairment did not meet or medically equal Listing 1.04. (R. at 17.) In addition, the ALJ found there is no medical listing for Mr. Robertson's headaches; however, when considering this impairment alone and "in combination with" Mr. Robertson's other impairment, the ALJ determined Mr. Robertson did not meet or medically equal any listing. *Id.*

The ALJ found that Mr. Robertson had the residual functional capacity ("RFC") to perform sedentary work consistent with the following limitations: he must be allowed to alternate between sitting and standing for at least five minutes per hour without leaving the workstation; he can do no more than the occasional bending, kneeling, stooping, and crawling; he cannot squat; and he must be allowed two days off per month. (R. at 18.) In making the above determinations, the ALJ found Mr. Robertson's statements regarding intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC assessment. *Id.* In doing so, the ALJ highlighted Mr. Robertson's objective medical evidence; daily activities; types, dosages, effectiveness, and side effects of any medication he takes or had taken to alleviate symptoms; and non-medication treatments. (R. at 18-22.)

From there, the ALJ detailed why he ascribed "considerable weight" to the opinion of the medical examiner, Dr. Hutson, and the opinion of treating specialist, Dr. Nordmann; and "some weight" to the opinions of the State agency medical consultants, the second consultative examiner, and treating primary care physician, Dr. Herbst. (R. at 22-23.) With regard to the effects of Mr. Robertson's medications, the ALJ explained why he ascribed "little weight" to Dr. Herbst's opinion. (R. at 23.) Specifically with regard to Mr. Robertson's mental impairment, the ALJ explained why he gave "considerable weight" to the State agency consultants. *Id.* Finally,

based on Mr. Robertson's RFC assessment, the ALJ concluded that he was able to perform his past relevant work as a masonry estimator. *Id.* Therefore, the ALJ determined that Mr. Robertson is not disabled. (R. at 25.)

## B.    Arguments On Appeal

Mr. Robertson makes four arguments on appeal.[3]  First, the ALJ erred in his determination of Mr. Robertson's RFC. Second, the ALJ's credibility determination incorrectly required objective medical evidence to directly corroborate subjective evidence of pain. Third, the ALJ failed to review the totality of the circumstances when making his credibility determination. Fourth, the ALJ failed to consider the combined effects of Mr. Robertson's impairments when determining Mr. Robertson's RFC. Each argument is addressed in turn.

### 1.    <u>Residual Functional Capacity Assessment</u>

First, Mr. Robertson argues that the ALJ erred in assessing his RFC, which "is the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545.  RFC assessments are based on "all the relevant evidence" in the case record. *Id.*  Ultimately, the ALJ concluded Mr. Robertson had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), with the following limitations: Mr. Robertson must be allowed to alternate between sitting and standing for at least five minutes per hour without leaving the workstation; he can do no more than the occasional bending, kneeling, stooping, and crawling; he cannot squat; and he must be allowed two days off from work per month. (R. at 18.) The Court finds that this RFC finding was supported by substantial evidence in the record.

In his RFC explanation, the ALJ gave "considerable weight" to the opinion of Dr. Hutson, the medical expert who testified at Mr. Robertson's hearing.  (R. at 22.)  He also gave

---

[3] Actually, according to Mr. Robertson's briefing, he made five arguments. However, for organizational purposes, the Court collapsed these into four arguments.

some weight to the opinion of the State agency medical consultant, Jonathan Sands, M.D. ("Dr. Sands") (R. at 22). In June 2006, Dr. Sands reviewed Mr. Robertson's entire claim file and completed a physical RFC assessment form. (R. at 325-32.) Dr. Sands concluded that Mr. Robertson could lift up to twenty pounds occasionally and ten pounds frequently; stand and or walk for a total of about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push and or pull (including the operation of hand and/or foot controls) for an unlimited amount of time. (R. at 326.) He also concluded that Mr. Robertson could balance, stoop, kneel, crouch, crawl, and occasionally climb ramps, stairs, ladders, ropes, and scaffolds. (R. at 327.) the ALJ's RFC finding was consistent with Dr. Sands' RFC assessment, which limited Mr. Robertson to light work, as defined in 20 C.F.R. § 404.1567(b), rather than sedentary work. The ALJ, however, further restricted Mr. Robertson to sedentary work based on Dr. Hutson's expressed concern that anything greater than sedentary work might damage his implanted spinal cord stimulator. (R. at 824, 828.)

In addition to Dr. Sands' and Dr. Hutson's medical opinions, the ALJ also relied on several additional medical opinions to support his RFC finding. In May 2006, Dr. M. Majid, a State agency medical consultant, performed a consultative examination of Mr. Robertson. (R. at 317-21.) In his summary of findings, Dr. Majid concluded that Mr. Robertson had no limitation on sitting, but did have limitations on standing and walking. (R. at 321.) Dr. Majid limited Mr. Robertson to lifting ten to twenty pounds. (R. at 321.) Later, in October 2007, Dr. Nordmann, who gave Mr. Robertson a steroid injection, wrote in his report that Mr. Robertson should lift no more than twenty pounds; he included no other restrictions, but he instructed Mr. Robertson to increase activities such as walking, weight loss, and range of motion exercises. (R. at 77.)

Based on these findings, the ALJ limited Mr. Robertson to sedentary work, which includes a maximum lifting amount of ten pounds. (R. at 18.)

In April 2008, Mr. Robertson's family doctor, Dr. Herbst, provided a statement for Mr. Robertson's attorney. (R. at 190-93.) Dr. Herbst stated that Mr. Robertson "absolutely should not be engaged in any kind of employment that would require much carrying, let alone lifting, and certainly avoiding any squatting or bending." (R. at 193.) Dr. Herbst believed that Mr. Robertson should "change his occupation from masonry work to something that is more sedentary" due to his joint and back problems. (R. at 193.) In addition, Dr. Herbst stated that Mr. Robertson was "often drowsy due to his medication," and that it would therefore be "very difficult to expect him to maintain any high functioning level of even a sedentary job that would require concentration and focus, which includes most desk jobs." (R. at 193.) The ALJ closely reviewed and accepted Dr. Herbst's opinion regarding Mr. Robertson's limitations on lifting and carrying, as well as the doctor's opinion that Mr. Robertson should be limited to sedentary work. (R. at 23.) With regard to Mr. Robertson's medication side effects, however, the ALJ gave "little weight" to Dr. Herbst's opinion because the record failed to demonstrate the side effects opined by Dr. Herbst. (R. at 23.)

According to the regulations, a treating source's opinion about the nature and severity of a claimant's impairments is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2). The regulations explicitly state that the ALJ "will always give good reasons in [his] notice of determination or decision for the weight [he gave a claimant's] treating source opinion." *Id.* Here, the ALJ gave several good reasons for the weight he gave Dr. Herbst's opinion regarding Mr. Robertson's side

effects to medications. (R. at 21.)  In doing so, the ALJ emphasized Mr. Robertson's testimony about the medications' side effects. Specifically, Mr. Robertson testified that Dr. Herbst occasionally checked to make sure his medications were not adversely affecting his liver and other systems, and that the only side effect he experienced was constipation. (R. at 821.)  Mr. Robertson did not mention drowsiness, impaired concentration, or any other symptom that would interfere with his ability to perform his past relevant work.  Plainly stated, substantial evidence supports the ALJ's RFC assessment.

## 2. <u>Credibility Determination</u>

Mr. Robertson next asserts that the ALJ erroneously relied only on the absence of objective medical evidence for his subjective complaints of pain.  For allegations of subjective symptoms, such as pain, the ALJ must make a credibility determination.  *Dampeer v. Astrue*, ___ F. Supp. 2d ___, 2011 WL 5169448, at *9 (N.D. Ill. Oct. 31, 2011).  Moreover, "[m]edical science confirms that pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004).  That said, the ALJ's credibility determinations are entitled to "special deference" because only the ALJ has the opportunity to observe the claimant testify.  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).  Thus, credibility determinations are only reversed if they are "patently wrong." *Id.*  Notwithstanding, the "special deference" afforded ALJs, the ALJ is still required to articulate his reasoning and discuss or distinguish any relevant contrary evidence. *See Banks v. Barnhart*, 63 Fed. Appx. 929, 935 (7th Cir. 2003).

When evaluating a claimant's subjective symptoms of pain, the ALJ must follow the guidelines provided in SSR 96-7p, which provides that the ALJ: (1) cannot base a finding of

disability on symptoms of pain unless there is medical evidence to prove the existence of a medically determinable impairment(s) that could be expected to produce the symptoms; (2) must evaluate the intensity, persistence, and functionally limiting effects of the symptoms when the existence of a medically determinable impairment(s) has been established to determine the extent to which the symptoms affects the claimant's ability to work; (3) carefully consider the claimant's statements about symptoms of pain with the rest of the relevant evidence in the case record if a disability determination that is fully favorable cannot be made solely on the basis of objective medical evidence; (4) consider the entire case record, including objective medical evidence, the individual's own statements about symptoms, and other information provided by treating or examining physicians about the symptoms and how they affect the claimant; and (5) provide specific reasons for the finding on credibility, supported by evidence in the case record. On this point, the ALJ stated explicitly that "whenever statements about intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record." (R. at 18.)

The ALJ's assessment of Mr. Robertson's credibility considered these guidelines. The ALJ's decision considered Mr. Robertson's ability to engage in a range of daily activities; the types, dosages, effectiveness, and side effects of any medications Mr. Robertson takes or has taken to alleviate symptoms; and Mr. Robertson's non-medication treatments. (R. at 18-22.) For instance, the ALJ specifically noted that "I find the claimant's activities of daily living are consistent with the ability to perform work as set forth in the residual functional capacity I have assessed for him." (R. at 19.) By considering this evidence and explaining how it influenced his credibility analysis, the ALJ followed the requirements for evaluating credibility of a claimant's

subjective complaints of pain.  Given the ALJ's explanation, the Court cannot find that this determination was "patently wrong."

### 3.      Totality of the Circumstances

Third, Mr. Robertson argues that the ALJ failed to completely review the totality of the circumstances when determining the credibility of his description of intensity, persistence, and limiting effects of his impairment.  When determining the credibility of a claimant the ALJ must consider all relevant evidence, including evidence of the following factors:

(1) daily activities;

(2) location, duration, frequency, and intensity of pain or other symptoms;

(3) precipitating and aggravating factors;

(4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the claimant received for relief of pain or other symptoms;

(6) measures the claimant uses or has used to relieve pain or other symptoms; and

(7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Mr. Robertson draws the Court's attention to the fifth factor.  He alleges that the ALJ failed to mention the spinal injections he received as treatment for his back pain. This is incorrect. In the ALJ's analysis of the type, dosage, effectiveness, and side effects of any medication Mr. Robertson takes or has taken to alleviate symptoms, he mentions that Mr. Robertson testified to receiving several epidural steroid injections that provided only temporary relief of his back pain.  (R. at 21.)  Along similar lines, it is also untrue that the ALJ mentioned "only physical therapy, exercises, and the nerve stimulator" in his evaluation of Mr. Robertson's

treatments. The ALJ specifically referenced the medications Mr. Robertson has taken and made it a point to note the epidural spinal injections. (R. at 21.) Indeed, it appears that the ALJ generally considered the above factors, as required by 20 C.F.R. § 404.1529(c)(3). (R. at 19-22.) Moreover, it is worth noting that the ALJ specifically acknowledged that Mr. Robertson would likely experience some amount of pain while doing sedentary work. But the existence of pain is not dispositive. As the ALJ noted, it is well-settled that "disability requires more than a mere inability to work without pain." (R. at 20) (citing *Stucky v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989)). Specifically, the ALJ accommodated Mr. Robertson's pain in his restrictive RFC finding.

Next, Mr. Robertson argues that the ALJ failed to acknowledge Mr. Robertson's consistency in describing pain to his various medical providers, and failed to consider observations made by a SSA employee, as required by SSR-96-7p. According to SSR-96-7p, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." Again, here the ALJ specifically acknowledged that Mr. Robertson might never work in a pain-free manner. Instead, the ALJ ruled that Mr. Robertson was not disabled because he could perform sedentary work, with certain restrictions. Moreover, it is worth emphasizing that the medical records are replete with references to Mr. Robertson's pain, and the balance of the ALJ's opinion makes clear that he reviewed the entire record. Thus, to the extent the ALJ failed to specifically mention the consistency of Mr. Robertson's complaints of pain (or the observations of the SSA employee), those errors are harmless. *See, e.g., Kittelson v. Astrue*, 362 Fed. Appx. 553, 557 (7th Cir. 2010) (The ALJ "did not *specifically* discuss how Kittelson's obesity and medications factored into his

assessment of her credibility, but his summary of her medical record reflects that he was aware of and considered them, so any error in not highlighting them was harmless.").

### 4. **Total Combined Effect of Impairments**

Last, Mr. Robertson contends that the ALJ failed to review the combined effects of his impairments. According to the regulations, an ALJ is required to consider the combined effect of all of a claimant's impairments, regardless of whether any impairment, considered separately, would be severe. *See* 20 C.F.R. § 404.1523; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). Mr. Robertson's argument resembles an argument made in *Getch v. Astrue*, 539 F.3d 473 (7th Cir. 2008), where Mr. Getch argued that the ALJ failed to give sufficient weight to the combined impact of his health problems. The Seventh Circuit found that the ALJ did, in fact, consider the combined impact of Mr. Getch's health problems and determined that his impairments were not severe enough "either singly or in combination," to equal one of the listed impairments. *Id.* at 483.

The same is true in this case. In the ALJ's decision, he explicitly stated that although Mr. Robertson's headaches did not have a specific listed impairment, he considered Mr. Robertson's headaches, "alone and in combination with" his other impairments, and determined he did not meet or medically equal a listing. (R. at 17.) Moreover, the ALJ made specific mention of Mr. Robertson's headaches, noting that Mr. Robertson "has a headache six to seven times per month." (R. at 20.) But, then, the ALJ accounted for Mr. Robertson headaches by "limiting his overall exertional level to [a] very modest requirement[]" and providing that he "be allowed two days off per month due to headaches." As for Mr. Robertson's depression, the ALJ specifically mentioned that it was not "severe" because it did not cause more than minimal limitations on his

ability to work. (R. at 16-17.) Accordingly, the Court is not persuaded by Mr. Robertson's argument.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the decision of the Commissioner of the Social Security Administration in this case is **AFFIRMED**. Final judgment shall accompany this entry.

         **SO ORDERED**.  03/28/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, pearlie.wadlington@usdoj.gov, lin.montigney@usdoj.gov

SSA (Court Use Only)
ch.il.ogc.sdindiana@ssa.gov, ODAR.OAO.COURT.1@ssa.gov

Andrew P. Sheff
BENNETT & SHEFF
apsheff@bennettsheff.com, lawoffice@bennettsheff.com